1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                        FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11    CORY MOSBY,                               No. C-09-1667 MMC

12              Petitioner,                      **ORDER DENYING PETITION FOR WRIT
                                                 OF HABEAS CORPUS**
13        v.

14    JAMES A. YATES,

15              Respondent.
      _____/

16

17         On April 15, 2009, petitioner Cory Mosby ("petitioner") filed the above-titled petition

18    for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the validity of his

19    state conviction.  Respondent James A. Yates has filed an answer and a memorandum of

20    points and authority in support thereof, to which petitioner has filed a reply.  Having read

21    and considered the papers filed in support of and in opposition to the petition, the Court

22    rules as follows.

23                              **PROCEDURAL HISTORY**

24         In September 2005, a San Mateo County jury convicted petitioner of three counts of

25    carjacking, two counts of kidnapping, and one count of robbery, all with findings that he

26    personally used a firearm and an assault weapon, as well as one count of assault with a

27    firearm, with a finding of personal use of an assault weapon.  (Clerk's Tr. ("CT") 547-48,

28    798.)  Additionally, allegations of two prior convictions and a prior prison term were found

United States District Court

For the Northern District of California

1  true by the trial court.  (Id.)  Petitioner was sentenced to a term of 31 years and four months

2  in state prison.  (CT 823-26, 830-32.)

3         On October 4, 2007, the California Court of Appeal affirmed the judgment.  People v.

4  Mosby, No. A112756, 2007 WL 2876099 (Cal. Ct. App. Apr. 13, 2006).  (Resp't's Ex. 5.)

5  On January 16, 2008, the California Supreme Court denied review.  Cal. Supreme Ct. No.

6  S258162. (Resp't's Exs. 6, 7.)

7                                   **STATEMENT OF FACTS**

8         The California Court of Appeal found the facts underlying petitioner's conviction to

9  be as follows:

10        [On July 29, 2004,] Bob Pierce was in the Bay Area on business.  He
          contacted an escort service that sent Krystal Dejulio to his hotel room.
11        While there, Dejulio received a telephone call from Ryan Hatcher, from
          whom she had bought marijuana a few days earlier, when she had also
12        met [petitioner].[1]  Hatcher offered Dejulio some marijuana, and Pierce
          agreed to go for a ride with Dejulio to get it.  Following Hatcher's
13        directions, Dejulio and Pierce drove to the Mardi Gras bar in Redwood
          City.
14
          When Dejulio and Pierce got out of the car, they were approached by
15        Hatcher and [petitioner], who wore a red sweatshirt with the hood up.
          Hatcher said they had to go "around the corner" to pick up the marijuana,
16        and his friend would accompany them.  Once they left the bar, Hatcher did
          not speak again.  Dejulio drove, Pierce rode in the front passenger seat,
17        and Hatcher and [petitioner] sat in the back. [Petitioner] directed Dejulio to
          drive to two different locations where he exited and they waited for him to
18        return to the car.

19        After [petitioner] got back into the car at the second location, Pierce and
          Dejulio suddenly noticed the long black barrel of a gun sticking out above
20        the console between the driver and passenger seats.  [Petitioner] said,
          "I'm sorry this has to happen to you.  We are just going to have to drop
21        this off, and if everything goes as planned, then you guys will be leaving
          tonight.  We are just going to go around the corner to drop it off."
22        [Petitioner] told Dejulio to continue down the alley, and directed her to
          drive toward the hills.  When Pierce said something that angered
23        [petitioner], [petitioner] punched him in the back of the head.  Dejulio told
          [petitioner] he could take the car and let her and Pierce out, and
24        [petitioner] pointed the gun at the back of her head and twisted her hair
          around the barrel.  When Dejulio told Hatcher he was at fault for allowing
25        this to happen and remaining silent, [petitioner] screamed, "Shut the fuck
          up. Don't talk to him." [Petitioner] told Dejulio to shut up and keep driving:
26        "[You're] going to drive wherever [I] want [you] to go.  Bitch. And that's
          that." [Petitioner] also screamed at Dejulio:  "Women don't talk. Men talk
27        only.  Shut up, bitch.  You know, I got 36 shells in this gun. I'm not afraid
          to use it . . . .  Let me take the safety off.  Now I'm ready."
28
          _____
          [1]  Dejulio knew Hatcher by the name "JJ."

                                              2

Dejulio drove as directed, and pulled into a parking lot in a dark wooded area at Canada College, facing an embankment.  Dejulio was afraid she would be shot.  Pierce thought he would "die in that parking lot."  [Petitioner] ordered Dejulio and Pierce out of the car, and told them to walk towards the embankment in front of the car headlights.  [Petitioner] demanded Pierce's wallet, and struck him on his left temple with the rifle when Pierce suggested that [petitioner] take the cash and let Pierce keep his wallet.  Pierce then gave his wallet to [petitioner], who threw it toward Hatcher.

[Petitioner] told Dejulio and Pierce to take off their clothes, and Hatcher threw Pierce's clothes in a tree.  [Petitioner] ordered Dejulio and Pierce to lie on the ground on their stomachs.  After he pat searched Dejulio, [petitioner] ordered both victims to stand and walk to the edge of the nearby cliff.  Pierce refused because he was afraid that if he did so, [petitioner] would shoot him in the back.  [Petitioner] again struck Pierce in the temple with the gun and drew blood.

[Petitioner] again ordered both victims to lie face down.  When Pierce raised his head and looked at [petitioner], he struck the back of Pierce's head with the gun barrel, again drawing blood.  Pierce put his head down and waited to be shot.  [Petitioner] ordered Dejulio and Pierce to start counting, and yelled to Hatcher to get the car ready.  [Petitioner] walked backwards toward the car, holding the rifle, and got into the front passenger seat.  The car drove off and was recovered at the scene of a single-car accident at 1:40 a.m.  Fingerprints from the car matched [petitioner's] and Hatcher's.  The gun used in the offenses was not recovered.

Once [petitioner] and Hatcher were gone, Dejulio called 911 on her cell phone.  Police responded and took statements from both victims.

. . . .

Pierce described the gunman as 24 to 25 years old, white, 6 feet tall, 180 pounds, with short reddish-brown hair, facial freckles, and no facial hair.  He wore a red sweatshirt with a hood, and gray sweat pants.  Pierce helped another police officer retrace the crime route.  They started at the Mardi Gras bar, and Pierce also took the officer to the alley behind 542 Vera Street.

Detective Eric Acha was assigned to investigate the case, and focused first on William Phillips as a suspect, based on the similarity of his tattoos to those Dejulio described previously seeing on [petitioner] and on Acha's prior contacts with Phillips near 542 Vera Street.  But when shown a photo lineup including Phillips's photo, Dejulio did not make an identification.  When Acha went to 542 Vera Street, he found a tank top, of the style Dejulio described the gunman as wearing, in the alley.  When Acha went to the motel where Dejulio had previously met both suspects, he obtained a copy of a driver's license for Ryan Hatcher, who generally matched the description of the unarmed suspect.  Acha also learned that the subscriber of the cell phone number that the gunman dialed on Dejulio's cell phone listed the same street address and date of birth as Hatcher's driver's license, although there was a different name on the account.  When he ran Hatcher's name through the police computer, Acha discovered that

1

2

Hatcher was previously contacted by police in the company of [petitioner].[2]  Acha also had previous contact with [petitioner], and focused on him as the second suspect.

3

4

5

6

When shown a photo of [petitioner], the bartender at the Mardi Gras confirmed he was at the bar on the night of the carjacking, and wore a red hooded sweatshirt.  On July 31, Dejulio made positive photo lineup identifications of [petitioner] and Hatcher as her assailants, stating she was "100 percent sure, no doubt."  When Acha e-mailed the photo lineups to Pierce  . . . shortly thereafter, Pierce immediately identified [petitioner] as the gunman, without any doubt.[]

7

8

9

10

11

12

13

On August 4, police executed a search warrant at the duplex at 542 Vera Street.  In the garage they found two bags of ammunition compatible with use in an assault weapon, including Russian bullets developed with the AK-47.  Inside one of the apartments, they found a red hooded sweatshirt.  [Petitioner] was arrested and his interview with Detective Acha was videotaped.  [Petitioner] admitted he and a friend named "JJ" were at the Mardi Gras bar and said that JJ had a woman and "another dude" pick them up in a car.  They were "going to go get them weed or something."[3]  [Petitioner] was very drunk and could not remember what happened after that, but heard "hella stories" and that "shit went crazy."  [Petitioner] repeatedly offered to cooperate with police to "bring people down" in exchange for leniency in this case.

14

. . . .

15

16

17

The trial court denied [petitioner's] motion to suppress Pierce's photo identification of him as the gunman, and concluded the lineup was not unduly suggestive, but excluded Pierce's in-court identification of [petitioner] because Detective Acha had told Pierce at the time of the preliminary hearing that he picked the right person.  At trial [petitioner] argued he was falsely identified as the perpetrator.

18

Mosby, 2007 WL 2876099, at *1-4.

19

Petitioner did not testify at the trial but, rather, sought to discredit the prosecution's

20

evidence on the issue of identity.[4]  Petitioner also sought to introduce evidence to show

21

bias on the part of the Redwood City Police Department, based on petitioner's previous

22

23

[2] At trial, another police officer testified that he saw [petitioner] and Hatcher in the alley at 542 Vera Street a few weeks before the carjacking. The prosecution also produced photos that showed [petitioner] and others in the same alley.

24

25

26

27

[3] [Petitioner] denied having a friend named Ryan, but said the name Ryan Hatcher was familiar and that might be JJ's last name.  When shown a photo [petitioner] identified Hatcher.  [Petitioner] claimed another friend, Mike Borg, was also present at the Mardi Gras that evening and was wearing a sweater or something with a hood.  [Petitioner] said they all got into a car driven by a girl with another man present, but [petitioner] claimed he was dropped off and later heard Borg and JJ "took some money from them or something."  Earlier, [petitioner] said Borg and JJ left him at the bar for a couple of hours, and then dropped him off at a friend's house.

28

[4]Petitioner called one witness, a co-worker, who testified he saw petitioner at work the afternoon of the following day, July 30, 2004, and noted nothing unusual in his demeanor or behavior.  (Reporter's Transcript ("RT") 1224-29).

1  arrest for drugs in the company of a Redwood City police officer's minor daughter.  Id. at *6.

2  The trial court excluded the evidence of bias as more prejudicial than probative and unduly

3  consumptive of time.  Id.  Additionally, petitioner sought to introduce a statement made by a

4  detective during petitioner's interview, specifically, the statement "this is a third strike for

5  you."  Id. at *7.  Petitioner argued the statement was necessary to place his offers to

6  cooperate in context, and, in particular, to counter an inference that such offers evidenced

7  a consciousness of guilt.  Id.  The trial court excluded this evidence as well.  Id.

8  **DISCUSSION**

9  **A.      Standard of Review**

10         A district court may not grant a petition challenging a state conviction or sentence

11  on the basis of a claim that was reviewed on the merits in state court unless the state

12  court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved

13  an unreasonable application of, clearly established Federal law, as determined by the

14  Supreme Court of the United States; or (2) resulted in a decision that was based on an

15  unreasonable determination of the facts in light of the evidence presented in the State court

16  proceeding."  28 U.S.C. § 2254(d); see also Williams v. Taylor, 529 U.S. 362, 412-13

17  (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue had a

18  "substantial and injurious effect or influence in determining the jury's verdict."  Penry v.

19  Johnson, 532 U.S. 782, 796 (2001) (internal citations omitted).

20         A state court decision is "contrary to" clearly established Supreme Court precedent

21  if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's]

22  cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of

23  [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."

24  Williams, 529 U.S. at 405-06.  "Under the 'unreasonable application' clause, a federal

25  habeas court may grant the writ if the state court identifies the correct governing legal

26  principle from [the] Court's decision but unreasonably applies that principle to the facts of

27  the prisoner's case."  Id. at 412.  "[A] federal habeas court may not issue the writ simply

28  because that court concludes in its independent judgment that the relevant state-court

5

1    decision applied clearly established federal law erroneously or incorrectly.  Rather, that

2    application must also be unreasonable."  Id. at 411.

3        The state court decision to which § 2254(d) applies is the "last reasoned decision"

4    of the state court.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v.

5    Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  Consequently, with respect to

6    petitioner's claims brought by the instant petition, all of which were raised by petitioner on

7    direct appeal, the Court "looks through" the California Supreme Court's summary denial of

8    the petition for review to the Court of Appeal's opinion denying the claims on the merits.

9    Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000) (citing Nunnemaker, 501

10   U.S. at 803-04).

11   **B.    Petitioner's Claims**

12       Petitioner brings three claims, based on the following rulings: (1) the trial court's

13   admission of Pierce's pretrial identification of petitioner from a photographic lineup; (2) the

14   trial court's exclusion of evidence of bias against petitioner; and (3) the trial court's

15   exclusion of evidence of petitioner's potential third strike.  The Court considers each claim

16   in turn.

17           **1.    The Pretrial Identification**

18       Petitioner contends he "was denied his federal due process right by the admission

19   of evidence of pretrial identification[] . . .  by witness Pierce that was the product of

20   procedures that [were] impermissibly suggestive . . . ."  (Pet. at 11.)  As noted, the trial

21   court admitted Pierce's pretrial identification of petitioner, whereby Pierce selected

22   petitioner's photograph from a photo spread.

23           **a.    Background**

24       The Court of Appeal described the facts relevant to this claim as follows:

25       [Petitioner] contends the photo lineup where Pierce identified him as the
         gunman was unduly suggestive and unreliable.  [Petitioner] bases his
26       argument on two characteristics of the lineup.  First, he says the lineup was
         suggestive because he is the only subject shown to be wearing any red
27       clothing, and Pierce described the perpetrator to be wearing a red sweatshirt.
         His second point about the lineup is that each subject is depicted above a
28       seven digit number, and since the number under defendant's picture is
         greater than the number under the other subjects, the enumeration suggested

1    [petitioner's] picture was the most recently obtained by police.

2    . . . .

3    The photo lineup where Pierce identified [petitioner] took place a few days
     after the robbery.  Detective Acha e-mailed the photo lineup to Pierce at his
4    office in Southern California, and faxed him an admonition form that he also
     read to Pierce over the phone.  Detective Acha remained on the line with
5    Pierce throughout the identification process, and stated that Pierce was fairly
     certain the person he identified was the gunman.  Pierce testified:  "As soon
6    as that photo lineup came up, I knew exactly which one of the individuals it
     was.  And I even pointed out that . . . this picture was not in the lineup I was
7    shown the other night."  Pierce "recognized the face right off the bat."  Pierce
     testified he "was sure of who the gunman was.  [He] was not positive as to the
8    other defendant.  [He] believed strongly, but it wasn't the same, 'I'm positive
     that's the guy.'"

9
     Pierce testified there was nothing about the clothing of the person he
10   identified during the photo lineup that caught his attention, and the clothing
     did not resemble what Pierce saw the gunman wearing on the night of the
11   incident.

12   In the photo lineup, [petitioner] was wearing what the court described as a
     "reddish or rather rusty-looking shirt . . . .  And then either a jacket or maybe
13   a velour or some type of outerwear." . . .  Detective Acha also testified that
     Pierce did not refer to the color of [petitioner's] shirt when he identified his
14   photo in the lineup.  [Petitioner] "note[s] that it is extremely unlikely that all 12
     members of this or any jury would be oblivious to the gang significance of the
15   color red, and that marking [petitioner] with this particular color was therefore
     grossly unfair and suggestive for that additional reason."  The trial court
16   excluded any evidence to suggest [petitioner] was associated with gang
     activity . . . .

17
     Mosby, 2007 WL 2876099, at *4-5, n.8.
18

19              **b.    Analysis**

20        Due process protects against the admission of evidence deriving from suggestive

21   pretrial identification procedures.  Neil v. Biggers, 409 U.S. 188, 196 (1972).   "[C]onvictions

22   based on eye-witness identification at trial following a pretrial identification by photograph

23   will be set aside on that ground only if the photographic identification procedure was so

24   impermissibly suggestive as to give rise to a very substantial likelihood of irreparable

25   misidentification."  Neil, 409 U.S. at 196-97.  An identification procedure is impermissibly

26   suggestive when it "emphasizes the focus upon a single individual," thereby increasing the

27   likelihood of misidentification.  See United States v. Bagley, 772 F.2d 482, 493 (9th Cir.

28   1985) (citing Simmons v. United States, 390 U.S. 377, 382-83 (1968).

                                         7

1     Here, in finding Pierce's pretrial identification of petitioner as the gunman

2  admissible, the Court of Appeal reviewed the record to determine whether the procedure

3  used by the police was "impermissibly suggestive," See Mosby, 2007 WL 2876099, at *4

4  (citing People v. Blair, 25 Cal.3d 640, 659 (1979)), and determined it was not.[5]  In so

5  holding, the Court of Appeal reasoned:

6         The mere fact that [petitioner's] "wearing of an item of apparel of the same color
          as that recalled by the witness-particularly a different item of apparel . . . does
7         not, without more, make the lineup unduly suggestive."  (People v. DeSantis,
          (1992) 2 Cal.4th 1198, 1223; see also, People v. Harris, (1971) 18 Cal. App. 3d
8         1, 6 ("[t]he mere fact that defendant was wearing the same [bright yellow] color
          pants worn by the robber did not make the lineup unfair").)[6]
9
          . . . .
10
          Nor has [petitioner] shown that the photo lineup was unduly suggestive because
11        his photo was labeled with a higher number than the others, even assuming that
          argument was not waived by [petitioner's] failure to raise it in the trial court.
12        Unlike the case cited by [petitioner], all the photos in the lineup shown to Pierce
          were number.  (People v. Carlos, (2006) 138 Cal. App. 4th 907, 912 (photo lineup
13        found unduly and unnecessarily suggestive where the defendant's was the only
          photo labeled with a name and identification number).)  [Petitioner] here cites no
14        support for his speculation that "[a] reasonable inference . . . might be drawn . . .
          that [his] photo is more recent than the others, and that it is more recent because
15        it was made specifically for this case—and thus that the actual subject of this
          photospread was [petitioner]."  Nor does the record support [petitioner's]
16        suggestion that Pierce drew such an inference, or that he relied in any way on
          the number when making his identification.  Instead, the record supports the trial
17        court's determination that Pierce identified [petitioner] in a photo lineup that was
          not unduly suggestive.
18

19  See Mosby, 2007 WL 2876099, at *4-5.

20     Based on the above, this Court finds petitioner has failed to show the Court of

21  Appeal's determination of this claim is contrary to, or involved an unreasonable application

22  of, clearly established federal law, nor has petitioner shown such determination was based

23
_____
24      [5]Although in so holding, the Court of Appeal cited to decisions of the California
Supreme Court and California Court of Appeal, a state court, to avoid the "pitfalls" of
25  AEDPA, need not cite to federal decisional law, provided "neither the reasoning nor the
result of the state-court decision contradicts" United States Supreme Court authority.  See
26  Early v. Packer, 537 U.S. 3, 8 (2002).
        [6]The record here does not necessarily support a finding that petitioner's attire in the
27  photograph was the same color as the red sweatshirt worn by the perpetrator.  See Mosby,
2007 WL 2876099, *5 n.8 ("In the photo line up, [petitioner] was wearing what the [trial]
28  court described as a 'reddish or rather rusty-looking shirt. . . . And then either a jacket or
maybe a velour or some other type of outerwear. . . .'  Defense counsel conceded the color
of defendant's shirt was 'not the football field on game day. . . .'").

1    on an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d).

2           Accordingly, petitioner is not entitled to relief based on the admission of Pierce's

3    pretrial identification of petitioner.[7]

4           **2.     Evidence of Bias**

5           Petitioner claims he "was denied his right of confrontation . . . and his right to present

6    a defense . . . by the exclusion of evidence of bias against him on the part of the Redwood

7    City police department . . . ."  (Pet. at 14.)  As noted, the trial court excluded the proffered

8    bias evidence as more prejudicial than probative.

9                **a.     Background**

10          The Court of Appeal described the facts relevant for this claim as follows:

11               [Petitioner] argues the trial court erred when it excluded evidence that he
                 was previously arrested for drugs in the company of a juvenile who was the
12               daughter of a Redwood City police officer.  [Petitioner] contends his arrest in
                 the company of a policeman's daughter biased the police against him and
13               caused them to focus on him as a suspect in this case, instead of pursuing
                 other possible leads.
14
                 In the prior incident, a deputy sheriff approached [petitioner] in a car that
15               also held another man and a juvenile female.  Marijuana and suspected
                 ecstasy found in the juvenile female's purse were determined to have come
16               from [petitioner].  The juvenile was released to her father, who was a
                 member of the Redwood City Police Department.  The father testified at trial
17               that he did not tell people at work about his daughter's case, and that he
                 was not involved in the "core investigation" of [petitioner's] case, but
18               participated in serving one of the search warrants and helped look for
                 [petitioner's] accomplice.  He thought he learned [petitioner] was a suspect
19               when the rest of the department was notified.  Detective Acha testified he
                 did not work with the girl's father in attempting to identify suspects in
20               [petitioner's] case, and only told the father [petitioner] was a suspect after
                 Pierce identified him in the e-mailed photo lineup.
21
                 The [trial] court . . . considered it "pure speculation . . . that [the juvenile's
22               father], in his displeasure with [petitioner], would have or did falsely—or the
                 Redwood City Police Department—focus on [petitioner] because of this
23               relatively minor incident involving [petitioner] and his daughter."  The court
                 found the evidence was not "sufficiently relevant or germane to these
24               proceedings" and "the probative value is clearly outweighed by the potential
                 prejudicial effect, or, more importantly, an undue consumption of time."
25               Accordingly, the [trial] court excluded the evidence pursuant to Evidence

26   ───────────────
        [7]  In light of its determination that the photographic lineup procedure was not
27   impermissably suggestive, the Court of Appeal did not go on to consider the reliability of the
     identification independent of such procedure.  See U.S. v. Givens, 767 F.2d 574, 582 (9th
28   Cir. 1985) (describing "two-step inquiry"; noting "if the identification procedure was
     impermissably suggestive, we must decide whether it was nonetheless reliable") (internal
     quotation and citation omitted).

1    Code section 352.

2    Mosby, 2007 WL 2876099, at *6.

3              **b.    Analysis**

4         "State and federal rulemakers have broad latitude under the Constitution to establish

5    rules excluding evidence from criminal trials."  Holmes v. S. Carolina, 547 U.S. 319, 324

6    (2006).  This latitude is limited, however, by a defendant's constitutional rights to due

7    process and to present a defense.  See id.  Although "well-established rules of evidence

8    permit trial judges to exclude evidence if its probative value is outweighed by certain other

9    factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury,"

10   the Constitution "prohibits the exclusion of defense evidence under rules that serve no

11   legitimate purpose or that are disproportionate to the ends that they are asserted to

12   promote."  Id. at 326.  To obtain habeas relief on the basis of an evidentiary error, however,

13   a petitioner must show not only that the error was one of constitutional dimension, but also

14   that the error had "'a substantial and injurious effect' on the verdict."  Dillard v. Roe, 244

15   F.3d 758, 767 n.7 (9th Cir. 2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 623

16   (1995).

17        Here, citing Holmes, 547 U.S. at 328-31 and Delaware v. Van Arsdall, 475 U.S. 673,

18   678-79 (1986), petitioner argues the exclusion of the above-described evidence of bias

19   deprived him of his right of confrontation and to present a defense.  The Court of Appeal

20   distinguished Holmes and Van Arsdall on their facts.  This Court agrees that the authority

21   on which petitioner relies is distinguishable.

22        In Holmes, the Supreme Court, in finding a constitutional violation, considered a state

23   law that precluded criminal defendants from introducing evidence of third-party guilt,

24   regardless of its probative value, where the prosecution's case as to the perpetrator's

25   identity was strong.  547 U.S. at 321, 331.  As the Supreme Court in Holmes

26   acknowledged, however, such evidence "may be excluded where it does not sufficiently

27   connect the other person to the crime, as for example, where the evidence is speculative or

28   remote, or does not tend to prove or disprove a material fact in issue at the defendant's

                                              10

1  trial." Mosby, 2007 WL 2876099, at *6 (citing Holmes, 547 U.S. at 327-31).   Here, in

2  contrast to the evidence proffered in Holmes, the evidence proffered by petitioner, as the

3  trial court found, was not "'sufficiently relevant or germane' to [the] proceedings."  Mosby,

4  2007 WL 2876099, at *6.  At best, the evidence arguably suggested an incentive on the

5  part of the police department to investigate petitioner's association with the crime.

6  Petitioner, however, did not dispute the facts of that investigation as recounted by the police

7  witnesses; rather, his defense focused on endeavoring to show Pierce was mistaken and

8  DeJulio was lying.  (RT 1268-83, 1290-98.)

9       Petitioner's reliance on Van Arsdall likewise is unavailing.  In Van Arsdall, the

10  Supreme Court held the defendant's right of confrontation was violated where the defense

11  sought to impeach a key prosecution witness and was not allowed to cross-examine him as

12  to his agreement to speak with the prosecutor in exchange for dismissal of the charges

13  against him in another matter.  Van Arsdall, 475 U.S. at 678-79.  Here, by contrast, as the

14  Court of Appeal noted, "[t]he juvenile's father had minimal involvement in the investigation

15  of [petitioner's] case," Mosby, 2007 WL 2876099, at *7, and, as discussed above, the

16  testimony of the police witnesses was not disputed.

17       Consequently, petitioner has not shown the Court of Appeal was unreasonable in

18  finding petitioner's constitutional rights were not violated by the trial court's exclusion of

19  evidence of the prior incident, given the undue consumption of time that invariably would

20  have resulted from the admission of such evidence and the potential for confusion of the

21  issues thereby.  See Holmes, 547 U.S. at 326 (holding "well-established rules of evidence

22  permit trial judges to exclude evidence if its probative value is outweighed by certain other

23  factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury").

24       Accordingly, petitioner is not entitled to relief based on the exclusion of evidence of

25  bias.

26       **3.      Statement Referencing Petitioner's Third Strike**

27       Petitioner claims he was "denied his rights . . .  to present a complete defense by the

28  court's rulings on [petitioner's] interrogation by police in which the court admitted

11

[petitioner's] statements offering to assist police in other prosecutions but limited statements by police threatening [petitioner] with life imprisonment in this case, thereby preventing [petitioner] from placing his conduct in its true light." (Pet. at 16.)  In particular, according to petitioner, the trial court erred by admitting petitioner's statements by which he offered to cooperate with police in other cases, but excluded one of two statements made by the detective to petitioner concerning the consequences he was facing, specifically, the statement "this is a third strike for you." (RT 883-884, 890-891.)  Petitioner claims the excluded statement was relevant to show a reason, other than consciousness of guilt, for his offers to cooperate.  Citing Crane v. Kentucky, 476 U.S. 683 (1986), petitioner argues the exclusion of the detective's reference to a "third strike" violated his due process right to present a defense.  The Court of Appeal found no constitutional error.

    "[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." Crane, 476 U.S. at 690.  The right to present a defense "includes, 'at a minimum . . . the right to put before a jury evidence that might influence the determination of guilt.'" United States v. Stever, 603 F.3d 747, 755 (9th Cir. 2010) (quoting Pennsylvania v. Ritchie, 480 U.S. 39, 56 (1987)).

    In upholding the exclusion of the reference to petitioner's third strike, the Court of Appeal's decision was not inconsistent with the reasoning or holding in Crane.  As the Court of Appeal noted, Crane involved a case built largely upon a 16-year-old defendant's confession to murder; the defense sought to introduce evidence showing the confession was obtained under oppressive and coercive circumstances, Mosby, 2007 WL 2876099, at *7 (citing Crane, 476 U.S. at 685), and the Supreme Court concluded "the 'blanket exclusion' of evidence related to the circumstances of the minor's confession deprived him of a meaningful opportunity to present a complete defense," id. at *7 (quoting Crane, 476 U.S. at 690).  Here, by contrast, as the Court of Appeal further noted, petitioner did not confess and there was no "blanket exclusion" of the circumstances surrounding petitioner's interview, either in general or as to the subject of cooperation.  Id.  Rather, the trial court admitted evidence showing the context of the offers, specifically, another statement, made

12

by the detective before petitioner offered to cooperate, in which the detective told petitioner: "I need to know what the fuck happened out there cause this is some serious shit.  This is the rest of your life we're talking about here."  Id.

Consequently, as the Court of Appeal found, "the jury was aware that [petitioner] knew he was facing serious consequences for his suspected involvement in these crimes." Mosby, 2007 WL 2876099, at *8.  Further, as the Court of Appeal observed, "the exclusion of the detective's reference to three strikes sentencing was consistent with the court's earlier ruling that barred mention in front of the jury of possible sentencing consequences to [petitioner]."  See id.; (see also CT 625 (CALJIC 17.42) ("In deliberating do not discuss or consider the subject of penalty or punishment.  That subject must not in any way affect your verdict."); CT 267 (Def.'s Proposed Jury Instructions)).

In sum, the Court of Appeal was not unreasonable in determining petitioner's constitutional rights were not violated by the exclusion of evidence similar to evidence that was admitted and where such excluded evidence "pose[d] an undue risk of . . . prejudice, [and] confusion of the issues."  See Crane, 476 U.S. at 689-90 (internal quotation and citation omitted).

Accordingly, petitioner is not entitled to relief based on the exclusion of the statement referencing the third strike.

### CONCLUSION

For the reasons set forth above, the petition for a writ of habeas corpus is hereby DENIED.

**IT IS SO ORDERED.**

Dated: February 10, 2011

_____
MAXINE M. CHESNEY
United States District Judge